UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

|  |  |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>    **Plaintiff,**<br><br>v.<br><br>**INVERS FOREX, LLC**, a Florida limited liability company; and **JUVENAL EDUARDO MACHADO**, (a.k.a. JUVENAL EDUARDO MACHADO BOGADI, EDWARD KAUFMAN and EDUARDO MACHADO), an individual,<br><br>    **Defendants.** | )<br>)<br>)<br>) Civil Action No. _____<br>)<br>)<br>)<br>) COMPLAINT FOR PERMANENT<br>) INJUNCTION, CIVIL MONETARY<br>) PENALTIES, AND OTHER<br>) EQUITABLE RELIEF<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff, the United States Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

### I. SUMMARY

1. From December 2008 to at least October 2010, Invers Forex, LLC ("Invers") and Juvenal Eduardo Machado (a.k.a. Juvenal Eduardo Machado Bogadi, Edward Kaufman and Eduardo Machado) ("Machado"), individually and in his capacity as the sole principal, officer, and employee of Invers (collectively "Defendants"), orchestrated and operated a Ponzi scheme.

2. Machado solicited friends, neighbors and members of his church to provide funds to trade off-exchange foreign currency contracts ("forex" or "forex contracts") on their behalf in accounts to be opened in their individual names. In return, Defendants promised to pay "interest" (i.e., profits) of five percent or more per month. Machado told prospective customers

1

that he had been very successful trading forex contracts, making consistent profits, and that he could give them financial freedom and security by trading their money in forex contracts.

3.  Defendants ultimately accepted at least $786,000 from at least 28 members of the general public (collectively the "customers") for the purpose of trading forex. Rather than opening individual trading accounts in the customers' names and depositing their funds into those accounts as promised, Defendants opened a single trading account in Machado's name and pooled a portion of the customers' funds – less than $135,000 – in this account, almost 90 percent of which was lost in trading. Defendants never told the customers about these losses or that only a portion of their funds were being traded, nor did Defendants' tell the customers about the pooling of their funds and Defendants' failure to open individual trading accounts for each customer. Instead, over time Defendants sent checks and cash to customers representing purported "interest" or profits and provided tax statements to customers reflecting these false profits. The customer funds not returned to the customers or lost in trading were used by Defendants to pay Machado's personal expenses and/or Invers' business expenses to which neither was entitled.

4.  At least as early as March 2010, in response to requests from multiple customers for the return of part or all of their funds, Defendants responded with delay. For example, Machado told at least one customer that she must wait six months for the expiration of her written trading agreement before her funds could be returned, even though the agreement provided that the customer could withdraw funds at any time with 30 days prior written notice.

5.  On information and belief, in or about the summer of 2010, Machado moved from his home in Miami, Florida to Ontario, Canada. Despite repeated demands from customers, Defendants have not returned the balance of customers' funds.

6. By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of the Commodity Exchange Act ("Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (subtitled "CFTC Reauthorization Act of 2008" ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII, §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et seq*.

7. Machado committed the acts and practices described herein within the course and scope of his employment at Invers.

8. Machado is a controlling person of Invers and he did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations alleged herein.

9. Accordingly, pursuant to Sections 6c and 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 13a-1 and 2(c)(2), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act, as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 1 *et seq.*, and to further enjoin Defendants from engaging in certain commodity or forex-related activity. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

10. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II. JURISDICTION AND VENUE

11. Section 6c(a) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13a-1, authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, or any rule, regulation, or order thereunder.

12. The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Sections 6c and 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 13a-1 and 2(c)(2).

13. Venue properly lies with the Court pursuant to Section 6c(e) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13a-1, because most, if not all, of the customers reside, and Defendants transacted business in, the Southern District of Florida, and certain transactions, acts, practices, and courses of business alleged in the Complaint occurred, are occurring, and/or are about to occur within this District.

## III. PARTIES

14. Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010). The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

15. Defendant **Invers Forex, LLC** is a Florida limited liability company with its principal office at 3131 SW 147th Court, Miami, Florida 33185. Invers was formed on January 8, 2009, as the successor company to Interior Remodeling USA, Inc. Machado was the manager

and registered agent for both Interior Remodeling USA, Inc. and Invers. Neither Invers nor Interior Remodeling USA, Inc. has ever been registered with the Commission in any capacity.

16. Defendant **Juvenal Eduardo Machado, a.k.a. Juvenal Eduardo Machado Bogadi, Edward Kaufman and Eduardo Machado,** is an individual whose last-known address is in Miami, Florida. On information and belief, Machado currently resides in Ontario, Canada. Machado is the sole principal, manager and Registered Agent of Invers. Machado has never been registered with the Commission in any capacity.

### IV. FACTS

17. Beginning in December 2008 and continuing to at least March 2010, Machado, individually and in his capacity as officer, employee, and agent of Invers, solicited his friends, neighbors and members of his church, among others, to provide him funds in order to trade forex contracts on their behalf. Many of his prospective customers attended prayer meetings in Machado's home, where Machado touted his forex trading experience and ability. Machado told customers and prospective customers that God had put him on the earth to help people financially, or words to that effect, and that by trading forex contracts for them, he could give them financial freedom for the rest of their lives. Machado also told them that he was one of the best forex traders in Miami, and that because his trading had been so profitable, others paid him to share his forex-trading techniques.

18. As part of his solicitation, Machado also told at least one prospective customer that he had never lost money trading forex. This statement was false.

19. As part of his solicitation, Machado also offered prospective customers guaranteed "interest" (i.e., profits) on their investments of five percent or more per month.

Defendants executed written trading agreements with their customers memorializing those guarantees and other terms of agreement.

20. The written trading agreements provided, *inter alia*, that:

   a. the customer would open a forex trading account in his or her own name at a futures commission merchant ("FCM") selected by Defendants where the customer's funds would be deposited;

   b. the customer authorized Defendants to trade forex in the account on the customer's behalf;

   c. Defendants would act in "good faith and seek to achieve the common goal of generating income by applying appropriate Capital Management;"

   d. the customer would earn five percent or more per month in "interest;" and

   e. while it was "suggested" to the customer to maintain his or her account for at least six months, the customer could withdraw his or her funds at any time upon 30 days prior written notice.

21. In fact, Defendants did not deposit the customers' funds into trading accounts in the customers' individual names, but rather, as more fully described below, Defendants pooled a portion of the customers' funds in a single account held in Machado's name and used the majority of the customers' funds for purposes other than trading forex on the customers' behalf.

22. While the written trading agreements contained various broad statements regarding the risk of loss associated with forex trading, the agreements also contained contradictory statements that such risks were limited. Specifically, the written trading agreements purported to limit risk by providing, *inter alia*, that:

    a. the maximum risk would not exceed 1.5 percent of the capital available in the customer's trading account; and

    b. in the event that 30 percent of the customer's "initial capital" was lost trading, Defendants would cease trading, notify the customer, and request the customer's permission to either continue trading the account or withdraw the customer's funds.

23. The written trading agreements also provided for compensation to the Defendants as follows:

    a. a commission equal to one percent of the amount of each deposit made by a customer;

    b. a commission equal to five percent of any monthly profits generated in the customer's account; and

    c. an "Annual Administration Commission" equal to one percent of the balance of the customer's account to be prorated on a monthly basis.

24. As a result of Defendants' misrepresentations, guarantees of monthly profits, assurances of limited risk, and Machado's claims of forex trading acumen, at least 28 people sent Defendants at least $786,000 between December 2008 and June 2010 for trading forex contracts. Defendants' customers gave their money to Defendants in the form of checks, wires, and cash. Between March 2009 and June 2010, customers sent more than $442,000 to Defendants in the form of checks or wires that were deposited into bank accounts controlled by Defendants. Between December 2008 and January 2010, three customers alone gave Machado $344,000 in cash for trading forex.

25.   Rather than use all of the customers' funds to trade forex as represented, Defendants deposited no more than $134,400 of these funds into two trading accounts held in Machado's name. Defendants never opened and funded individual trading accounts in the customers' names.

26.   Between December 2008 and April 2009, Defendants deposited a total of $22,000 of the customers' funds into a forex trading account in the name of Juvenal Eduardo Machado Bogadi at Forex Capital Markets, LLC, ("FXCM"), a registered FCM. These funds were used to trade forex from December 2008 to June 2009.

27.   In June 2009, Defendants transferred the customers' funds from FXCM to an account in Machado's name at Forex Capital Markets, Ltd., a then foreign affiliate of FXCM. Between June 2009 and May 2010, Defendants deposited an additional $112,400 of the customers' funds into this foreign account and used those funds to trade forex from June 2009 to October 2010. Between December 2008 and July 2010, Defendants withdrew a total of $6,495 from these trading accounts. The current balance of the Forex Capital Markets, Ltd. account is $7,788.

28.   Of the $134,400 of customer funds traded by Defendants in the two forex trading accounts between December 2008 and October 2010, Defendants incurred total net trading losses of $120,117, or almost 90 percent of the total funds traded.

29.   Rather than report these trading losses to their customers and prospective customers, Defendants caused statements in the form of checks and IRS forms to be issued to customers indicating that their individual accounts were profitable when, in fact, they were not (and had never been opened in the first place).

30.  Between January 2009 and June 2010, Defendants sent almost 200 checks to customers denominated as "interest" totaling more than $260,000. In addition, upon information and belief, some customers received "interest" payments from Defendants in the form of cash. These "interest" payments purportedly represented profits earned in the customers' purported accounts based on Defendants' forex trading. During this same period, an additional $71,000 was returned to customers in the form of checks denominated as something other than "interest."

31.  In addition to making false interest payments, Defendants' caused their accountant (who was also one of Defendants' customers) to prepare and send false IRS forms 1099-INT (for the tax year 2009) to the customers. These forms reflected purported interest payments totaling $98,884 for 2009, even though Defendants' actual forex trading resulted in total net realized and unrealized losses of $60,568.36 in 2009.

32.  Beginning at least as early as March 2010, some of Defendants' customers asked Defendants to return all or a portion of the funds that they had provided to trade forex. At first, Defendants responded to these requests with excuses and delay. For example, Machado told one customer (who had invested in December 2009) that she could not withdraw her funds until May 2010, six months from the time she had invested, even though Defendants' written trading agreement with the customer provided that the customer's funds could be withdrawn at anytime upon 30 days written notice. In May 2010, Machado then told her that she was required to give him an additional 30 days written notice in order to withdraw her funds. To date, at least four customers have demanded that Defendants return a total of $289,550 of their funds; however, Defendants have failed to honor these customers' requests.

33. In May or June of 2010, without returning all of the customers' remaining funds, Machado moved from his home in Miami to Ontario, Canada. Machado's telephone number in Miami has been disconnected, and his customers have not been able to contact him.

34. The customers' funds not returned to the customers, lost in trading, or remaining in Machado's trading account were used by Defendants to pay Machado's personal expenses and/or Invers' business expenses. Defendants were not authorized or entitled by the written trading agreements or otherwise to utilize these funds in this manner.

35. Neither Defendants nor the FCMs that were the counterparties to the forex transactions conducted by Defendants were financial institutions, registered broker dealers, insurance companies, bank holding companies, or investment bank holding companies, or the associated persons of such entities.

36. Neither Defendants nor the customers who provided funds to the Defendants were "eligible contract participants" as that term is defined in the Act. *See* Section 1a(12)(A)(v), and (xi) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 1a(12)(A)(v), and (xi) (an "eligible contract participant," as relevant here, is an individual with total assets in excess of $10 million).

37. The forex transactions conducted by Defendants on behalf of the customers were entered into on a margined or leveraged basis. The forex transactions conducted by Defendants neither resulted in delivery within two days nor created an enforceable obligation to deliver between a seller and a buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business. Rather, these forex contracts remained open from day to day and ultimately were offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

38. At all material times, Machado was the sole principal, officer, and employee of Invers and was responsible for all of Invers' acts.

39. Machado engaged in the acts and practices described above knowingly, willfully, or with reckless disregard for the truth.

40. Machado committed the acts and omissions described herein within the course and scope of his employment at Invers.

41. Invers, by and through its agents, including Machado, engaged in the acts and practices described above knowingly, willfully, or with reckless disregard for the truth.

42. By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of the Act, as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 1 *et seq.*

### V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

#### COUNT I

**Violations of Sections 4b(a)(2)(A)-(C) of the Act as Amended by the CRA, to be Codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C)**

43. The allegations set forth in paragraphs 1 through 42 are realleged and incorporated herein by reference.

44. Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C), make it unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or](C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order

> or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C), apply to the forex transactions, agreements or contracts offered to or entered into by Defendants for or on behalf of the customers as if they were contracts of sale of a commodity for future delivery. Section 2(c)(2)(C)(iv) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv).

45. As set forth above, from at least December 2008 through October 2010, in or in connection with forex contracts, made, or to be made, for or on behalf of or with, other persons, Machado and Invers, by and through Machado, cheated or defrauded or attempted to cheat or defraud customers or prospective customers and/or willfully deceived or attempted to deceive customers or prospective customers by, among other things, knowingly (i) misappropriating customer funds that were to be used to trade forex contracts, and (ii) fraudulently soliciting customers and prospective customers, all in violation of Sections 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

46. As set forth above, from at least January 2009 through June 2010, in or in connection with forex contracts, made, or to be made, for or on behalf of or with, other persons, Machado and Invers, by and through Machado, willfully made or caused to be made to the other persons false reports or statements or willfully entered or caused to be entered for the other persons false records, by, among other things, knowingly issuing false profit checks and false IRS forms 1099-INT, all in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

47. Machado engaged in the acts and practices described above either knowingly or with intent to deceive or with reckless disregard for the truth.

48.     Machado controlled Invers, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Invers' conduct alleged in this Complaint; therefore, pursuant to Section 13(b) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13c(b), Machado is liable for Invers' violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

49.     The foregoing acts, misrepresentations, omissions, and failures of Machado occurred within the scope of his employment, office, or agency with Invers; therefore, Invers is liable for these acts, misrepresentations, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

50.     Each act of misappropriation, misrepresentation or omission of material facts, and making or causing to be made a false report or statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

### VI.     RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)     An order finding that Defendants violated Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

b)     An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly, in conduct in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA and the Dodd-Frank Act, to be

codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

  c) An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from, directly or indirectly:

    1) trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended by the CRA, and the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

    2) entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

    3) having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

    4) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

    5) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

    6)  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

    7)  acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

  d)  An order directing Defendants, as well as any successors to any Defendant, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  e)  An order directing Defendants to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  f)  An order directing each Defendant to pay a civil monetary penalty for each violation of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, described herein, plus post-judgment interest, in the amount of the higher of: 1) $140,000 for each violation of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, or 2) triple the monetary

gain to the Defendants for each violation of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, described herein, plus post-judgment interest;

    g)    An order directing Defendants and any of their successors to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by Defendants as a result of the acts and practices that constitute violations of the Act and/or Regulations as described herein;

    h)    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

    i)    Such other and further relief as the Court deems proper.

Dated: June 23, 2011

Respectfully submitted,

ATTORNEY FOR PLAINTIFF U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1151 21st Street NW
Washington, DC 20581
(202) 418-5000 (main)
(202) 418-5531 (fax)

Matthew Elkan
Special Bar A5501023
DC Bar No. 413161
(202) 418-5398 (direct)
*melkan@cftc.gov*

Daniel C. Jordan
Special Bar A5501473
VA Bar No. 36382
(202) 418-5339 (direct)
*djordan@cftc.gov*